# United States Court of Appeals
## For the First Circuit

---

Nos. 09-1308, 09-1309

GLOBAL NAPS, INC.,

Plaintiff/Counterclaim Defendant, Appellant,

v.

VERIZON NEW ENGLAND INC. d/b/a VERIZON MASSACHUSETTS,

Defendant/Counterclaim Plaintiff, Appellee,

MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY; PAUL
B. VASINGTON, in his capacity as Commissioner; JAMES CONNELLY, in
his capacity as Commissioner; W. ROBERT KEATING, in his capacity
as Commissioner; DEIRDRE K. MANNING, in her capacity as
Commissioner; and EUGENE J. SULLIVAN, JR., in his capacity as
Commissioner.

Defendants,

v.

GLOBAL NAPS NEW HAMPSHIRE, INC.; GLOBAL NAPS REALTY, INC.; GLOBAL
NAPS NETWORKS, INC.; FERROUS MINER HOLDINGS, LTD.; and FRANK
GANGI,

Counterclaim Defendants, Appellants,

CHESAPEAKE INVESTMENT SERVICES, INC.; 1120 HANCOCK STREET, INC.,
321 HEATH STREET REALTY TRUST; CJ3, INC.; and RJ EQUIPMENT, INC.,

Counterclaim Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, <u>Chief Judge</u>,
Boudin and Howard, <u>Circuit Judges</u>.

---

<u>Andrew Good</u> with whom <u>Philip Cormier</u>, <u>Good & Cormier</u>, <u>Joel Davidow</u>, <u>Kile Goekjian Reed & McManus PLLC</u>, <u>Eric Osterberg</u>, and <u>Fox Rothschild LLP</u> were on brief for appellants/counterclaim defendants.

<u>Scott H. Angstreich</u> with whom <u>Gregory G. Rapawy</u>, <u>Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.</u>, <u>Robert L. Weigel</u>, <u>Jason W. Myatt</u>, <u>Gibson, Dunn & Crutcher LLP</u>, <u>Richard P. Owens</u>, <u>Verizon New England Inc.</u>, <u>Paul J. Larkin, Jr.</u>, and <u>Verizon Communications Inc.</u> were on brief for appellee/counterclaim plaintiff.

<u>James C. Schroeder</u>, <u>Christian F. Binnig</u>, <u>Hans J. Germann</u>, <u>Stephen Sanders</u>, and <u>Mayer Brown LLP</u> were on brief for amici curiae AT&T ILEC Companies in support of appellee/counterclaim plaintiff.

---

April 29, 2010

**LYNCH**, **Chief Judge**.  Global NAPs, Inc. (GNAPs) appeals from entry against it of a judgment for $57,716,714 for access charges that GNAPs owed but failed to pay Verizon New England Inc. (Verizon) for services Verizon provided between 2003 and 2006. Concerned that GNAPs could not pay a judgment, Verizon also successfully brought counterclaims alleging alter ego liability and disregard of the corporate form against GNAPs; its owner, Frank Gangi; and several GNAPs affiliates.  These defendants appeal from the district court's assertion of federal jurisdiction and grant of default judgment, which holds Gangi and the affiliates jointly liable for the sum GNAPs owes.  We affirm.

In an issue of first impression for this court, we hold that 28 U.S.C. § 1367, enacted in 1990, gives federal courts supplemental jurisdiction over both compulsory and at least some permissive counterclaims.  This alters this circuit's former rule, adopted before the enactment of § 1367, that required permissive counterclaims to have an independent basis for jurisdiction.  See McCaffrey v. Rex Motor Transp., Inc., 672 F.2d 246, 248 (1st Cir. 1982).  Our ruling brings us into line with the Second and Seventh Circuits, as we describe below.  Jones v. Ford Motor Credit Co., 358 F.3d 205, 210-14 (2d Cir. 2004); Channell v. Citicorp Nat'l Servs., Inc., 89 F.3d 379, 384-87 (7th Cir. 1996).

In 2002 the Massachusetts Department of Telecommunications and Energy (DTE) ruled that GNAPs must pay long-

-2-

distance access charges to Verizon whenever ISP traffic is actually routed outside the caller's local area, regardless of the phone number the internet user dialed. GNAPs fought that ruling and did not pay any of those charges. Verizon terminated its service to GNAPs in 2006.

This is GNAPs' fourth appeal in a series of disputes between GNAPs and Verizon, which arose from GNAPs' efforts to avoid the DTE's ruling. See Global NAPs, Inc. v. Verizon New England, Inc. (GNAPs IV), 489 F.3d 13, 21-25 (1st Cir. 2007) (affirming release of security GNAPs posted to obtain an injunction pending appeal after the injunction was vacated); Global NAPs, Inc. v. Verizon New England, Inc. (GNAPs III), 444 F.3d 59, 71-75 (1st Cir. 2006) (holding a 2001 FCC order did not preempt the state DTE's authority); Global NAPs, Inc. v. Mass. Dep't of Telecomm. & Energy, (GNAPs II), 427 F.3d 34, 43-49 (1st Cir. 2005) (holding the Massachusetts DTE was not bound under the Full Faith and Credit Clause to a Rhode Island agency's interpretation of the effect of an FCC order on GNAPs' and Verizon's Rhode Island agreement); Global NAPs, Inc. v. Verizon New England, Inc. (GNAPs I), 396 F.3d 16, 18-19 (1st Cir. 2005) (holding GNAPs could not opt to use an agreement it had with Verizon in a different state after undergoing arbitration before the DTE).

GNAPs has appealed here again on a number of arguments, which challenge federal jurisdiction, the liability finding, and

the amount of the damages assessed. We reject GNAPs' first argument, that it cannot be liable for any charges imposed pursuant to the DTE order because a 2008 Federal Communications Commission (FCC) order preempts the DTE's 2002 decision. The 2008 order is not materially different on this preemption issue from an earlier order, which we held did not preempt the DTE. GNAPs III, 444 F.3d at 69-75.

We also reject GNAPs' challenges to judgments against it on two of Verizon's counterclaims, one to enforce the DTE's order and recover long-distance access charges and the other to pierce GNAPs' corporate veil and hold Gangi and GNAPs' affiliates jointly liable. We reject the argument of all defendants that the district court lacked jurisdiction over these counterclaims. There is subject matter jurisdiction over both claims because 28 U.S.C. § 1367(a) gives courts supplemental jurisdiction over compulsory and at least some permissive counterclaims. Verizon's counterclaims are sufficiently related to the underlying litigation within the test set forth in § 1367(a) to fall under federal courts' supplemental jurisdiction. We also reject GNAPs' argument that Verizon first had to ask the DTE to enforce its order before suing in federal court because GNAPs waived this exhaustion argument.

Finally, we affirm judgment on both counterclaims. We affirm the district court's calculation of damages GNAPs owes Verizon for failing to pay access charges under the DTE's order.

-4-

We hold the district court did not abuse its discretion by granting default judgment on the claim to pierce GNAPs' corporate veil as a discovery sanction against GNAPs, Gangi, and three GNAPs affiliates: Global NAPs Networks, Inc. (GNAPs Networks), Global NAPs Realty (GNAPs Realty), and Global NAPs New Hampshire (GNAPs New Hampshire) (collectively, the GNAPs companies). Evidence these defendants committed misconduct and spoliation was compelling. And we affirm that collateral estoppel barred GNAPs' holding company, Ferrous Miner Holdings, Ltd. (Ferrous), from challenging these discovery-misconduct findings.

I.

Some pertinent background information, setting up the issues in this appeal, may be helpful. Our prior decisions give further background, and we assume familiarity with them.

A.        The Telecommunications Act and Interconnection Agreements

The Telecommunications Act of 1996 (TCA), now over a decade old, has promoted greater competition in the telecommunications industry. See GNAPs II, 427 F.3d at 36. It requires local carriers to "interconnect" with each other's networks, pursuant to interconnection agreements (ICAs). Id. at 36-37; see also 47 U.S.C. §§ 251(a), 252. Carriers can voluntarily negotiate terms and, after an impasse, can ask state commissions to set terms in binding arbitration. 47 U.S.C. § 252(a)-(b).

Those ICAs must specify how the carriers will share fees from local calls.  Id. § 252(a)(1).  Section 251(b)(5) requires carriers to pay "reciprocal compensation" for local calls, in which the carrier for the customer making the call shares fees with the carrier that terminates the call.  For long-distance calls (known as "interexchange" traffic), in contrast, the long-distance carrier pays "access charges" to the carriers that originated and terminated the call.  See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 (Local Competition Order), 11 F.C.C.R. 15499, 16012-14 (1996) (distinguishing local and interexchange fees).[1]

The TCA sets some federal requirements for all ICAs, 47 U.S.C. § 251(b)-(c), but leaves some room for state regulation.  For example, carriers must submit all ICAs--even those negotiated privately--to state commissions, which can require that ICAs meet local regulations.  See id. § 252(e).  If parties undergo arbitration, the TCA somewhat limits state commissions' discretion to set terms.  See id. § 252(b)-(d).  Carriers may ask a federal court to review whether a state commission's decision under § 252 conforms to the TCA.  Id. § 252(e)(6).

---

[1]    The FCC determined in 1996 that reciprocal compensation under § 251(b)(5) applies only to local calls and ruled that long-distance carriers still must pay access charges, as they did before the TCA.  See Local Competition Order, 11 F.C.C.R. at 16013; see also GNAPs III, 444 F.3d at 63.

B.         Factual Background

At issue in this case is what charges Verizon and GNAPs owe each other from dial-up internet traffic between some of their customers. For our purposes, Verizon's customers were dial-up internet users; GNAPs' customers were the ISPs that connected Verizon's customers to the internet. Because dial-up service uses telephone lines, these calls were networked like a phone call. A Verizon customer's modem dialed a phone number belonging to GNAPs' ISP customer. The ISP's server equipment "answered" that call and connected the user to websites. In early 2002, GNAPs and Verizon began renegotiating a new ICA for calls from Verizon's Massachusetts customers to these ISPs.

ISP calls do not fit the traditional reciprocal-compensation scheme and can produce windfall profits for ISPs' carriers, like GNAPs. ISPs receive many, long calls, entitling their providers to large reciprocal-compensation fees from the internet customer's carrier (here, Verizon). But ISPs do not make calls, defeating the reciprocal arrangement. The FCC has long sought a solution to this problem. See Core Commc'ns, Inc. v. FCC, 592 F.3d 139, 141-43 (D.C. Cir. 2010) (describing that history).

GNAPs further exploited this imbalance by giving its ISP customers virtual NXX (VNXX) phone numbers. Unlike normal numbers, VNXX numbers do not reflect the actual location of the number's

owner.[2] GNAPs gave its ISP customers VNXX numbers that would appear local to the internet user, Verizon's customers. But the ISP was often in fact located out of the internet user's calling area. In other words, apparently local calls were often networked as long-distance calls.

GNAPs has argued to the DTE[3] and in court that VNXX numbers that appear local--even if the ISP is actually located elsewhere--are subject to reciprocal compensation. Verizon has argued that it should be able to charge access charges and not have to pay reciprocal compensation to any calls that are routed to an ISP outside a Verizon customer's local area.

On December 12, 2002, after arbitration, the Massachusetts DTE sided with Verizon It ordered the parties to adopt an ICA requiring them to pay reciprocal fees for genuinely local calls and GNAPs to pay access charges when an ISP was actually located outside the internet customer's local area. The DTE ordered GNAPs to inform Verizon where its ISP customers were located so Verizon could properly bill GNAPs.

---

[2] Carriers normally determine the location of call participants by the second string of three digits in their phone numbers, called the NXX. The NXX corresponds to the physical location of a "switch" that routes a call. The switch is located near the owner of the phone number and thus can "serve[] as [a] prox[y] for geographic location." GNAPs III, 444 F.3d at 64.

[3] The DTE's name was recently changed to the Department of Telecommunications and Cable. For simplicity, we use DTE.

This ICA went into effect on January 27, 2003, and Verizon began billing GNAPs. For three years, GNAPs fought the DTE's ruling and did not pay access charges. It also did not give Verizon information about its ISP customers' locations. Verizon terminated its service to GNAPs in April 2006. This appeal concerns Verizon's efforts to collect three years of overdue access charges.

## II.

GNAPs sued Verizon in federal district court in Massachusetts on December 30, 2002. After GNAPs litigated and lost an argument in 2005 that it could opt into a different ICA and avoid the DTE's order, see GNAPs I, 396 F.3d at 24-28, the parties turned to the meat of GNAPs' lawsuit. GNAPs claimed that a 2001 FCC order preempted the DTE's authority to decide rates for all ISP traffic, including VNXX interexchange traffic, relying on In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 (ISP Remand Order), 16 F.C.C.R. 9151 (2001).

On April 11, 2006, this court disagreed with GNAPs and held that the ISP Remand Order only clearly regulated local traffic. GNAPs III, 444 F.3d at 71-75. Applying the presumption against preemption, we ruled the ISP Remand Order did not govern interexchange VNXX traffic and upheld the DTE's order. Id.

Earlier, on January 12, 2005, GNAPs had filed a separate lawsuit to obtain payment from Verizon for charges GNAPs said Verizon owed it. GNAPs claimed that the ISP Remand Order and another, related FCC order[4] imposed reciprocal rates of $0.0007 on all ISP traffic. GNAPs sought its purported share of reciprocal fees from Verizon. The district court consolidated this suit with GNAPs' lawsuit claiming preemption.

Verizon responded to GNAPs' 2005 lawsuit by counterclaiming for the access charges GNAPs owed under the DTE's 2002 order. Verizon claimed breach of contract, specifically of the ICA. In September 2006, after GNAPs had litigated and lost its preemption claim, the district court granted Verizon's motion for judgment on the pleadings on GNAPs' 2005 complaint.

That left Verizon's counterclaim for breach of the ICA. The parties began conducting discovery on GNAPs' liability and potential damages on that claim in late 2006. It was not until June 2007, however, that GNAPs argued for the first time that Verizon had to bring its claim to enforce the ICA to the state commission (here, the DTE) before suing in federal court. The district court rejected that argument.

---

[4] See Petition of Core Communications for Forbearance under 47 U.S.C. § 160(c) from Application of the ISP Remand Order, 19 F.C.C.R. 20179, 20184-86 (2004) (refusing to forbear enforcing the rate cap set in the ISP Remand Order and not mentioning or expressly changing the ISP Remand Order's preemption provisions).

On November 5, 2008, the FCC issued a new order addressing its authority to regulate ISP traffic, In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Developing a Unified Intercarrier Compensation Regime, Intercarrier Compensation for ISP-Bound Traffic (Second Remand Order), 24 F.C.C.R. 6475 (2008). That order did not arise out of this dispute but addressed different issues. The district court, on November 18, 2008, rejected GNAPs' argument that the Second Remand Order made the clear statement of preemption that the ISP Remand Order had lacked earlier and preempted the DTE order.

By late 2008, the district court was also ready to resolve Verizon's counterclaim to enforce the ICA. It concluded that this court's decision rejecting GNAPs' original preemption claim "established Verizon's right to collect . . . access charges" and that "the only question [wa]s the amount due."[5] As we explain in more detail below, to determine that amount, the court had to resolve how many minutes of VNXX calls were subject to the DTE's order that GNAPs pay access charges--meaning the court had to exclude any local calls subject to reciprocal compensation and any calls made to GNAPs customers outside Massachusetts and not under

---

[5] GNAPs had dismissed all other claims it raised in its earlier lawsuit to obtain final judgment and appeal the court's rejection of its preemption argument based on the ISP Remand Order.

the DTE's order. The court then had to decide what rate per minute GNAPs owed for access charges and any interest.

The parties agreed how many total minutes of VNXX traffic were at issue. The court applied judicial estoppel against GNAPs on two key issues, the rate per minute of access charges and the percentage of GNAPs customers that were in Massachusetts and subject to the DTE's order. The court held GNAPs was bound to representations it had made on both issues when seeking an injunction while litigating its preemption claim in 2005.

The district court resolved the final two issues--the percentage of calls that were local and the amount of interest--on summary judgment. The parties' experts had originally agreed on the percentage of local traffic. The court rejected GNAPs' expert's tardy "revised" report, filed one week before trial, which estimated a higher percentage of local traffic, as well as a Verizon employee's e-mail that GNAPs insisted created an issue of fact. The court held the ICA set interest rates for overdue charges. It granted judgment for Verizon for $57,716,714.

Well before obtaining judgment, Verizon feared that GNAPs would not pay any judgment it owed. By 2006 it began to suspect that GNAPs was transferring its assets to avoid paying a judgment. The district court permitted Verizon to attach GNAPs' assets in September 2006. Verizon says it discovered there was less than $1 million in GNAPs' name.

Verizon amended its counterclaim on December 4, 2006, alleging that GNAPs commingled and hid its assets. The amended counterclaim added to count one, which again claimed breach of the ICA, two new counts: count two claimed fraudulent transfer of assets and count three claimed alter ego liability and disregard of the corporate form.

The counterclaim added new defendants whom Verizon alleged should share GNAPs' liability. Three GNAPs affiliates became defendants: GNAPs New Hampshire, which acts as the "banker" for all GNAPs companies, receiving and disbursing their money so they can pay their bills; GNAPs Networks, which manages GNAPs' infrastructure; and GNAPs Realty, which holds GNAPs' property and leases. The amended counterclaim also added as defendants Ferrous, a holding company that owns all of these entities, and Frank Gangi, founder and sole shareholder of Ferrous.[6] All of these companies, including GNAPs, are pass-through entities that pay their income to their shareholder, Frank Gangi, who pays their taxes.

The defendants unsuccessfully moved to dismiss counts two and three as permissive counterclaims that needed, and lacked, an independent basis for federal jurisdiction. Meanwhile, the defendants resisted Verizon's requests for discovery of their

_____

[6]     Verizon included two other defendants and added several others in a second amended complaint filed in 2008. The district court did not hold these defendants responsible for GNAPs' liabilities. Verizon does not challenge that decision and those defendants are not parties to this appeal.

-13-

financial records.  Beginning on December 1, 2006, the district court issued a series of orders rejecting GNAPs' repeated efforts to block discovery.

Evidently GNAPs and the other defendants were resisting discovery orders in a Connecticut district court as well.  On July 1, 2008, that court granted default judgment against GNAPs, the GNAPs companies, and Ferrous for willful discovery violations.  S. New England Tel. Co. v. Global NAPs, Inc. (SNET), 251 F.R.D. 82, 96 (D. Conn. 2008).  The SNET court found substantial evidence the defendants had concealed and destroyed evidence.  Id. at 90-95.

In October 2008, Verizon moved for entry of default judgment as a sanction for discovery violations by all defendants. After a three-day evidentiary hearing in December, the district court granted default judgment on count three, which alleged alter ego liability and disregard of the corporate form, against GNAPs, Gangi, and the GNAPs companies.  It also held Ferrous was collaterally estopped from disputing the findings in the SNET decision and granted default judgment on count three against Ferrous as well.  The court held all counterclaim defendants jointly and severally liable with GNAPs for the full judgment amount.

The defendants appeal.

-14-

A.    The FCC's 2008 Second Remand Order Does Not Preempt or Establish that the FCC's 2001 Order Preempted the DTE's Authority to Impose Rates for Interexchange ISP Traffic

GNAPs argues that the FCC's 2008 Second Remand Order[7] establishes that the 2001 ISP Remand Order preempted intercarrier compensation for all ISP-bound traffic and so preempts the DTE's 2002 decision that GNAPs must pay access charges for interexchange VNXX traffic. We review that preemption claim de novo. GNAPs III, 444 F.3d at 70-71.

In GNAPs III we held that the FCC, in the 2001 ISP Remand Order, exercised only its authority to regulate local ISP traffic and did not preempt state authority to regulate interexchange ISP traffic. Id. at 72, 75. We distinguished between the FCC's assertion of regulatory authority and its exercise of that authority. Id. at 71. Even if the FCC had authority to regulate all ISP traffic, the ISP Remand Order was intended to resolve regulatory-arbitrage problems with reciprocal compensation for local traffic. Id. at 74. We explained that the FCC had to clearly state its intent to preempt state authority to regulate access charges for interexchange traffic as well, which the ISP Remand Order did not explicitly do. Id. at 72-74. We ruled the ISP Remand Order therefore did not preempt the DTE's decision. Id. at 75.

---

[7]    All remand orders refer to FCC orders, as identified.

GNAPs argues that the FCC's 2008 Second Remand Order made it clear that its 2001 order had preempted the DTE order. Not so. The Second Remand Order is not materially different from the ISP Remand Order on the issues of concern to us, and our holding in GNAPs III applies to this case as well. GNAPs' argument to the contrary misreads the 2008 order's language.

The 2008 Second Remand Order simply clarified the legal basis for the authority the FCC had asserted in earlier orders to regulate local ISP traffic and prevent regulatory arbitrage. See Second Remand Order, 24 F.C.C.R. at 6476-78. The order was a response to a ruling of the D.C. Circuit Court of Appeals that a legal basis for the ISP Remand Order's assertion of jurisdiction likely existed, but that order had rested on the wrong jurisdictional ground.[8] Id. Thus, the issues the FCC addressed in the 2008 order did not go to regulation of intercarrier compensation for interexchange ISP traffic.

The 2008 Second Remand Order did not change the 2001 ISP Remand Order's rate regime or preemptive effect, as the D.C.

---

[8]    ISP Remand Order relied on § 251(g) of the TCA to impose interim reciprocal-compensation rates of $0.0007 per minute for ISP traffic and to preempt state commissions' authority to set different rates in the future. ISP Remand Order, 16 F.C.C.R. at 9171-74. The D.C. Circuit reversed but did not vacate that order, reasoning that the FCC likely had authority to impose those rates but not under § 251(g). WorldCom, Inc. v. FCC, 288 F.3d 429, 430 (D.C. Cir. 2002).
The Second Remand Order relied on § 201 of the TCA instead. Second Remand Order, 24 F.C.C.R. at 6483-86. The D.C. Circuit upheld that jurisdictional basis. Core Commc'ns, 592 F.3d at 141.

Circuit has recognized. To the contrary, that order "instituted substantially the same rate cap system" as the ISP Remand Order. Core Commc'ns, 592 F.3d at 142; see also Second Remand Order, 24 F.C.C.R. at 6486-89 (continuing the rate system in the ISP Remand Order). As the FCC told the D.C. Circuit in Core Communications, that rate system applies "when two [carriers] collaborate to deliver calls to an ISP within a local calling area." Brief of FCC at 21, Core Commc'ns, 592 F.3d 139 (emphasis added). The Second Remand Order did not revisit (or mention) preemption of ISP-bound traffic at all.

The Second Remand Order's express purpose was to justify--not change--a particular rate system. We held, in GNAPs III, that system applied only to local ISP traffic. GNAPs' contrary argument takes language in the Second Remand Order out of context and ignores the purpose of the order.[9]

GNAPs notes that the order concluded that § 251(b)(5)'s reciprocal-compensation scheme does not apply only to "local" traffic. The FCC was merely ruling that § 251(b)(5) is not limited to traditional telephone local traffic but to all forms of telecommunications, including ISP traffic. Id. at 6479-83. The FCC was rejecting its prior interpretation that § 251(b)(5) did not

---

[9]   Because we hold the Second Remand Order does not preempt interexchange ISP traffic, we do not reach GNAPs' argument that the district court erred by concluding the order is not retroactive.

-17-

include ISP traffic at all.[10]  Id.  It was not, however, distinguishing local and interexchange ISP traffic, which is the pertinent question for us.[11]

The Second Remand Order did describe ISP-bound traffic as "interstate" and "interexchange."  24 F.C.C.R. at 6478.  But that does not mean the FCC was preempting interexchange fees, as GNAPs urges.  The FCC was explaining why it had jurisdiction to regulate ISP traffic under § 201 of the TCA, which permits the FCC to impose rates and regulations that further the TCA's goals on interstate telecommunications traffic.  See 47 U.S.C. § 201; see also Core Commc'ns, 592 F.3d at 143.  GNAPs' argument misses the point that "[a] matter may be subject to FCC jurisdiction, without the FCC having exercised that jurisdiction and preempted state regulation." GNAPs III, 444 F.3d at 71.  Here, the FCC has not exercised jurisdiction over interexchange traffic.  Our conclusion that the

_____

[10]    In its first attempt to solve the reciprocal-compensation imbalance ISP traffic creates, the FCC had ruled that ISP traffic was exempted from § 251(b)(5)'s reciprocal compensation scheme altogether.  In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 14 F.C.C.R. 3689, 3697-98 (1999).  It reasoned that ISP traffic terminates at the website, not the internet server, and therefore is never local. Id.  The D.C. Circuit vacated that order, holding that the FCC's understanding of ISP traffic was likely wrong.  Bell Atl. Tel. Cos. v. FCC, 206 F.3d 1, 9 (D.C. Cir. 2000).

[11]    GNAPs misleadingly argues that the Second Remand Order says that reciprocal compensation "is not limited geographically." The order actually says that the TCA's definition of telecommunications is not geographically limited and concludes that "telecommunications" includes ISP traffic and not merely local phone service.  Second Remand Order, 24 F.C.C.R. at 6479.

-18-

FCC preempted only state regulation of _local_ ISP traffic remains unaffected.

GNAPs also observes the order discusses "intercarrier compensation" rather than "reciprocal compensation" and urges us to conclude that the order intended to reach reciprocal fees as well as access charges. The Second Remand Order does not assign such significance to this language or even mention access charges. Instead, it expressly preserved the rate scheme in the ISP Remand Order that we have held governs only local ISP traffic. Isolated words cannot overcome the Second Remand Order's text or the presumption against preemption. See GNAPs III, 444 F.3d at 71-72.

GNAPs' argument fails. We turn to GNAPs' arguments that the federal courts could not hear Verizon's counterclaims for payment of access charges.

B.        Jurisdictional Issues

GNAPs argues no federal jurisdiction exists over Verizon's two successful counterclaims, count one to enforce the ICA and count three alleging alter ego liability and disregard of the corporate form. GNAPs also argues that Verizon failed to exhaust its administrative remedies by not first seeking to enforce the ICA in the DTE.

We reject GNAPs' argument that there is no federal jurisdiction and hold that 28 U.S.C. § 1367 confers jurisdiction over compulsory and at least some permissive counterclaims. We

-19-

also hold GNAPs waived its exhaustion argument and do not reach the merits.

1. <u>Federal Jurisdiction over Count One, Verizon's Counterclaim to Enforce the ICA</u>

GNAPs first argues that Verizon improperly enforced the ICA in federal court rather than first asking the DTE to interpret and enforce the agreement. Although § 252 of the TCA details how parties, states, and federal courts can draft and approve ICAs, it is silent on how and in what fora parties can enforce ICAs. Among other issues, courts remain uncertain whether state commissions can enforce ICAs,[12] whether state commissions ever must or should first interpret and enforce ICAs,[13] and when federal courts have

_____

[12] The TCA is silent on whether state commissions can interpret and enforce ICAs or simply approve them. The Supreme Court and this court have not yet answered that question, <u>see</u> <u>Verizon Md., Inc.</u> v. <u>Pub. Serv. Comm'n</u> (<u>Verizon Md. I</u>), 535 U.S. 635, 641-42 (2002), and we need not do so now. Most circuits, however, have held that state commissions have that authority. <u>See, e.g.</u>, <u>Sw. Bell Tel., L.P.</u> v. <u>Pub. Util. Comm'n</u>, 467 F.3d 418, 422 (5th Cir. 2006); <u>e.spire Commc'ns, Inc.</u> v. <u>N.M. Pub. Regulation Comm'n</u>, 392 F.3d 1204, 1207 (10th Cir. 2004); <u>Iowa Network Servs., Inc.</u> v. <u>Qwest Corp.</u>, 363 F.3d 683, 691-92 (8th Cir. 2004); <u>BellSouth Telecomms., Inc.</u> v. <u>MCImetro Access Transmission Servs., Inc.</u>, 317 F.3d 1270, 1277 (11th Cir. 2003) (en banc); <u>MCI Telecomms. Corp.</u> v. <u>Ill. Bell Tel. Co.</u>, 222 F.3d 323, 337-38 (7th Cir. 2000). The FCC has reached this conclusion as well. <u>In re Starpower Commc'ns, LLC</u>, 15 F.C.C.R. 11277, 11280 (FCC 2000).

[13] <u>Compare</u> <u>Core Commc'ns, Inc.</u> v. <u>Verizon Pa., Inc.</u>, 493 F.3d 333, 342-44 (3d Cir. 2007) (holding that state commissions must first interpret and enforce ICAs), <u>and</u> <u>BellSouth Telecomms.</u>, 317 F.3d at 1277-78 (holding that state commissions first must interpret and enforce ICAs and federal courts can then review that decision), <u>with</u> <u>Ill. Bell Tel. Co., Inc.</u> v. <u>Global NAPs Ill., Inc.</u>, 551 F.3d 587, 593-96 (7th Cir. 2008) (Posner, J.) (holding that state commissions have "primary jurisdiction" over difficult issues

-20-

jurisdiction over ICA-enforcement actions.[14]  We need not decide these issues here, but they undergird the parties' disputes.

GNAPs argues that even if federal courts hypothetically have jurisdiction over claims to enforce ICAs, the proper procedure is for state commissions--here, the DTE--to first interpret and enforce an ICA, after which federal courts may review that decision under 47 U.S.C. § 252(e)(6).  It concludes that Verizon's claim is premature.

Verizon rejects GNAPs' prematurity argument as based on two questionable assumptions: first, that state commissions have the authority under the TCA to enforce interconnection agreements, and second, that any implicit authority in state commissions is meant to be exclusive and prevents federal courts from hearing ICA-enforcement claims otherwise properly before them.  Verizon contends that its ICA-enforcement claim is properly in federal court, either because there is federal question jurisdiction over

---

particularly within their competence that arise from ICA-enforcement disputes, which federal courts can choose to invoke).

[14]     The Supreme Court held that federal courts at least have jurisdiction over claims that federal law preempted a state commission decision regarding an ICA.  Verizon Md. I, 535 U.S. at 642-43 (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983)).  The Fourth Circuit held that ICAs are so bound with federal law that actions to enforce them arise under federal law. Verizon Md., Inc. v. Global NAPs, Inc. (Verizon Md. II), 377 F.3d 355, 362-65 (4th Cir. 2004).  The Seventh Circuit took a more nuanced view, opining that garden-variety enforcement claims are creatures of state contract law, though some claims could create federal-question jurisdiction.  Ill. Bell, 551 F.3d at 591-93.

the claim under 28 U.S.C. § 1331 or, at a minimum, there is supplemental jurisdiction under 28 U.S.C. § 1367.

We need not decide the first point, whether state commissions can hear ICA-enforcement claims, because we conclude Verizon's counterclaim is properly in federal court. We think it is clear that, at a minimum, there is supplemental jurisdiction under § 1367[15] over Verizon's counterclaim to enforce the ICA. We agree with Verizon that Congress did not withdraw that jurisdiction to hear this counterclaim in the TCA. See Verizon Md. Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 644 (2002) (holding that § 252 of the TCA "at least does not divest the district courts of their authority under 28 U.S.C. § 1331"); see also United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 9 (1st Cir. 2005) (noting that a "strong presumption against implied repeals of federal statutes is even stronger when the federal statute in question confers federal jurisdiction).

Verizon's counterclaim is more than sufficiently related to GNAPs' complaint. Both parties' claims ultimately arise from a dispute over the same agreement and involve the same basic factual question: what fees the carriers owe each other. See, e.g., Bell S. Telecomm., Inc. v. Town of Palm Beach, 252 F.3d 1169, 1176 (11th Cir. 2001) (reviewing a claim seeking declaratory judgment that an

---

[15] We decline Verizon's invitation to rule on the different question of whether we have independent federal question jurisdiction under § 1331 over its claim to enforce an ICA.

ordinance was preempted and a counterclaim to enforce the ordinance); see also 6 Wright, Miller & Kane, Federal Practice and Procedure § 1410, at 70-72, 78-79 (1990) (noting that courts generally find claims that are logically related arise from the same transaction and reporting that courts have held that some claims based on the same contract are sufficiently related).

Given the existence of jurisdiction, we treat GNAPs' prematurity argument as a type of administrative-exhaustion argument.[16] Arguments that a party failed to exhaust its administrative remedies are waivable unless an exhaustion requirement is jurisdictional. See Frederique-Alexandre v. Dep't of Natural & Envtl. Res., 478 F.3d 433, 440 (1st Cir. 2007). And exhaustion requirements are not jurisdictional unless Congress has explicitly designated them as such. See Arbaugh v. Y&H Corp., 546 U.S. 500, 516 (2006). The TCA does not mention an exhaustion requirement, let alone limit subject matter jurisdiction.

Without suggesting that there would be, on these facts, any merit to the argument, we hold GNAPs has waived it. GNAPs did

---

[16] GNAPs has expressly disavowed any desire for us to invoke the discretionary doctrine of primary jurisdiction, and so we do not. GNAPs asks us to dismiss the case and let the DTE resolve it in the first instance, the procedure for administrative exhaustion. Reiter v. Cooper, 507 U.S. 258, 268-69 (1993).

GNAPs is wrong in suggesting that, under Illinois Bell, we could hold that the DTE has exclusive primary jurisdiction and dismiss the case. GNAPs ignores that opinion's plain statement that the court was invoking discretionary and not exclusive primary jurisdiction. Ill. Bell, 551 F.3d at 595-96.

not raise this argument until nearly two years after Verizon filed its counterclaim, and only after GNAPs' other arguments had been rejected.  It would be inequitable to allow GNAPs to sandbag its opponent at this late stage, and it would disserve judicial economy.[17]

2.    Jurisdiction over Verizon's Counterclaim for Alter Ego Liability and Disregard of the Corporate Form

GNAPs makes a different and more complicated argument that there is no federal jurisdiction over count three, which alleged alter ego liability and disregard of the corporate form against GNAPs and the other defendants.  GNAPs argues that at most this counterclaim is permissive, not compulsory.  As such, GNAPs concludes, the counterclaim is outside federal courts' supplemental jurisdiction and requires an independent basis for jurisdiction. We hold that we have supplemental jurisdiction over this counterclaim, regardless of whether it is compulsory or permissive.

This court has not before considered the scope of statutory supplemental jurisdiction over counterclaims.  The supplemental jurisdiction statute, 28 U.S.C. § 1367, was enacted in 1990.  Some decisions before the enactment of § 1367 adopted a rule that federal courts could exercise supplemental jurisdiction over

---

[17]    As a result, we do not comment on decisions GNAPs cites in support of its argument that, at least sometimes, parties must first ask state commissions to interpret ICAs.  See Ill. Bell, 551 F.3d 587, 594-95; Core Comm'cns, 493 F.3d at 344; BellSouth Telecomms., 317 F.3d at 1277-78.

-24-

compulsory but not permissive counterclaims.[18] E.g., McCaffrey, 672 F.2d at 248; see also 6 Wright et al., supra § 1422, at 169-70. Permissive counterclaims needed to have an independent federal jurisdictional basis. McCaffrey, 672 F.2d at 248; 6 Wright et al., supra § 1422, at 169-70.

This distinction arose from judge-made law of jurisdiction over what are now called supplemental claims--claims that lack an independent basis for federal jurisdiction--law which evolved in the absence of explicit congressional authorization. Put simply, courts distinguished jurisdiction over pendent claims--those brought by the plaintiff--and ancillary claims--those brought by third parties.[19] Pendent claims had to arise from the same "common nucleus of operative fact" as the underlying claim having a basis for federal jurisdiction. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Lower courts held that ancillary claims, such as counterclaims, had to arise from the same transaction or occurrence. See W.A. Fletcher, "Common Nucleus of Operative Fact"

---

[18] In one case after enactment of the supplemental jurisdiction statute in 1990 we did note the rule that permissive counterclaims required an independent basis for jurisdiction. Iglesias v. Mut. Life Ins. Co. of N.Y., 156 F.3d 237, 241 (1st Cir. 1998). But we did not rely on that rule to decide the case, nor did we consider the effect of the 1990 statute on it. Id. It does not bind us here.

[19] Jurisdiction over other parties was even more complicated; those nuances are not relevant in this case. See generally, e.g., Exxon Mobile Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552-57 (2005).

-25-

and Defensive Set-Off: Beyond the Gibbs Test, 74 Ind. L.J. 171, 174-75 (1998); 13 Wright et al., Federal Practice and Procedure § 3523, at 176-77 (3d ed. 2008). The Supreme Court never reconciled these lines of cases. See generally 13 Wright et al., supra § 3523, at 157-85 (tracing this history); W.C. Perdue, Finley v. United States: Unstringing Pendent Jurisdiction, 76 Va. L. Rev. 539, 541-51 (1990) (same).

Courts drew the line for ancillary jurisdiction at the transaction-or-occurrence test for practical reasons. Some counterclaims needed to be raised to avoid preclusion in a later proceeding. Courts, hesitant to expand federal judicial power, limited supplemental jurisdiction to counterclaims which had to be raised or waived: that is, compulsory counterclaims arising out of the same transaction or occurrence as the underlying suit. See Channell, 89 F.3d at 385; 13 Wright et al., supra § 3523, at 177.

Not all courts agreed. Judge Friendly rejected the conventional view. See United States v. The Heyward-Robinson Co., Inc., 430 F.2d 1077, 1088 (2d Cir. 1970) (Friendly, J., concurring). So did Judge Becker. Abromovage v. United Mine Workers of Am., 726 F.2d 972, 988-90 (3d Cir. 1984). They and some commentators criticized this rule as historically and legally unsound and unwise. See Jones, 358 F.3d at 210-12 (describing that debate).

In 1990 Congress enacted a supplemental jurisdiction statute, 18 U.S.C. § 1367. The statute does not use the terminology of "permissive" or "compulsory." It gives federal courts supplemental jurisdiction over all claims that are part of the same Article III case or controversy:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). This language confers jurisdiction over all claims that are part of the same Article III case, subject to two exceptions, listed in subsections (b) and (c), which do not apply here.[20]

---

[20] Subsection (b) restricts supplemental jurisdiction in diversity cases over some kinds of claims, but not counterclaims brought under Rule 13. See 28 U.S.C. § 1367(b); Allapattah, 545 U.S. at 559-60. Specifically, it excepts, in diversity actions, "claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure" and claims by people seeking to join under Rule 19 or intervene under Rule 24. 28 U.S.C. § 1367(b). These claims must meet all requirements for diversity jurisdiction. Id. This list does not include Rule 13, and in any event this case was not brought in diversity.

Subsection (c) allows district courts to decline to exercise supplemental jurisdiction when "the claim raises a novel or complex issue of State law," when the supplemental claim "substantially predominates over" the underlying claim properly in federal court, when "the district court has dismissed all claims over which it had original jurisdiction," or "in exceptional circumstances." The district court in this case did not opt to decline jurisdiction.

By its plain text, then, § 1367(a) governs supplemental jurisdiction over counterclaims. See Exxon Mobile Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558-59 (2005) (interpreting § 1367(a)'s plain text, which confers a "broad grant of supplemental jurisdiction"). We join two circuits and virtually all commentators in holding that Article III's case-or-controversy standard is the jurisdictional limit for counterclaims. Jones, 358 F.3d at 212-13; Channell, 89 F.3d at 385; see also, e.g., C.D. Floyd, Three Faces of Supplemental Jurisdiction after the Demise of United Mine Workers v. Gibbs, 60 Fla. L. Rev. 277, 290 (2008).

In so doing, we hold that § 1367 supersedes case law on supplemental jurisdiction that had distinguished between compulsory and permissive counterclaims. Accord Jones, 358 F.3d at 212; Channell, 89 F.3d at 385. The statute's plain text does not distinguish or limit jurisdiction over counterclaims, though it imposes other limits. See 18 U.S.C. § 1367(a)-(b). And as the Supreme Court observed, "nothing in § 1367 indicates a congressional intent to recognize, preserve, or create some meaningful, substantive distinction between the jurisdictional categories we have historically labeled pendent and ancillary." Allapattah, 545 U.S. at 558-59. Thus § 1367 abolishes the conceptual framework underpinning the old compulsory-permissive counterclaim distinction.

We need not define the outer boundary of the phrase "so related . . . . that [the claims] form part of the same case or controversy under Article III" to decide this case, and we will not do so here. Much scholarly commentary has debated the meaning of "case" and "controversy"[21] in Article III, as well as in § 1367(a), and the question is a difficult one.[22]

---

[21] Many scholars have argued that those terms have very different meanings, which could affect federal jurisdiction. See R.J. Pushaw, Article III's Case/Controversy Distinction and the Dual Functions of Federal Courts, 69 Notre Dame L. Rev. 447, 450-518 (1994) (citing other scholars and proposing a historical interpretation). This debate does not affect our analysis in this case. See id.

[22] This difficulty arises in part because civil procedure has changed dramatically since the framing of the Constitution, and it is not clear what an Article III "case" means in contemporary practice.

At the time of the framing, American courts used the English common law "cause of action" to govern procedure. See, e.g., A.J. Bellia, Article III and the Cause of Action, 89 Iowa L. Rev. 777, 782-92 (2004); see also Osborn v. Bank of U.S., 22 U.S. (9 Wheat) 738, 823 (1824); R.A. Matasar, Rediscovering "One Constitutional Case": Procedural Rules and the Rejection of the Gibbs Test for Supplemental Jurisdiction, 71 Cal. L. Rev. 1399, 1479-87 (1983).

But the Federal Rules of Civil Procedure made civil procedure more flexible by liberalizing rules for joining claims and parties in civil cases. See J.T. Molot, How Changes in the Legal Profession Reflect Changes in Civil Procedure,84 Va. L. Rev. 955, 986 (1998). This practice is incongruent with the scope of traditional causes of action. See Bellia, supra, at 792-99.

In 1966 the Supreme Court defined an Article III case as one comprised of claims arising from a "common nucleus of operative fact," such that the plaintiff "ordinarily would be expected to try them in one judicial proceeding." Gibbs, 383 U.S. at 725. Gibbs rejected earlier cases defining jurisdiction by a "cause of action" as unduly narrow and confusing. 383 U.S. at 722-75. The Court adopted a theory of a case--factual relatedness--that motivated the drafters of the Federal Rules of Civil Procedure. See Bellia, supra, at 792-98; Matasar, supra, at 1448-54.

There is scholarly commentary criticizing Gibbs and its

-29-

In this case we need only decide that supplemental jurisdiction is somewhat broader than the transaction-or-occurrence test. No Supreme Court case had ever established the same transaction-or-occurrence test as the boundary of Article III case-or-controversy requirement. <u>Gibbs</u>, the Court's only decision deciding the scope of an Article III "case," instead looked to whether the claims arose from a "common nucleus of operative fact." <u>Id.</u> at 725.

Verizon's alter-ego counterclaim is sufficiently related to the underlying litigation to fall within Article III's jurisdiction. This litigation disputes what fees the parties owe each other and involves efforts by both parties to collect claimed fees from a discrete and common body of calls. Count three was part of Verizon's effort to collect those fees when GNAPs attempted to avoid payment. Other courts have accepted supplemental

reliance on close factual identity, however. <u>See, e.g.</u>, Fletcher, <u>supra</u>, at 176-78 (arguing that <u>Gibbs</u> is historically, legally, and practically wrong); Matasar, <u>supra</u>, at 1477-90 (same). Scholars contend that this rule, though perhaps practical, has no basis in the Constitution. Matasar, <u>supra</u>, at 1477-90.

Courts and commentators have proposed a variety of possible standards for supplemental jurisdiction. The Seventh Circuit, relying on <u>Gibbs</u>, held that a counterclaim need only have a "loose factual connection" between claims to satisfy § 1367. <u>Channell</u>, 89 F.3d at 385. Scholars have proposed a variety of other boundaries. <u>See, e.g.</u>, Floyd, <u>supra</u>, at 310-17 (urging a "necessary and proper" test for jurisdiction); Fletcher, <u>supra</u>, at 178-79 (proposing defining Article III based on history or on modern rules of procedure); Matasar, <u>supra</u>, at 1481-82 (arguing that Article III reaches any procedural rules Congress adopts). Although we need not adopt any of these approaches, we note that all are broader than the transaction-or-occurrence test.

jurisdiction over claims to pierce the corporate veil and similar claims.  See, e.g., Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1037 (7th Cir. 2000).

This is not a situation in which there could be any due process constraints on the exercise of jurisdiction.  In this case, it was sensible for the district court to try Verizon's claim to pierce the corporate veil with the rest of the litigation, rather than sending count three to state court.  The case had already consumed years of litigation.  The district court was familiar with, and had developed expertise on, the complicated claims at issue.  It was also thoroughly familiar with GNAPs' many efforts to avoid paying access charges--useful information for a court assessing GNAPs' conduct.  Finally, there was nothing unfair about trying this claim with the rest of the litigation.

C.       Judgment for Verizon on Its Counterclaims Was Proper

We turn to the district court's resolution of Verizon's two counterclaims on the merits.  Our rejection of GNAPs' preemption argument removes GNAPs' only argument as to liability. What is left is a dispute over the amount of damages GNAPs and the other defendants owe Verizon.

1.       Verizon's Counterclaim to Enforce the ICA

GNAPs first challenges the district court's method for calculating that GNAPs owed Verizon $57,716,714 in damages.  We review the district court's application of judicial estoppel in

support of that conclusion for abuse of discretion, <u>Alternative Sys. Concepts, Inc.</u> v. <u>Synopsys, Inc.</u>, 374 F.3d 23, 30 (1st Cir. 2006), and its grant of summary judgment in Verizon's favor on the amount of damages de novo, <u>Thore</u> v. <u>Howe</u>, 466 F.3d 173, 178 (1st Cir. 2006).

To calculate the amount of damages, the district court first had to decide how many minutes of traffic were subject to access charges. That calculation involved three issues: how many minutes of calls occurred between 2003 and 2006, what percentage of that traffic was intrastate and subject to the DTE's order, and what percentage of traffic was local and therefore subject to reciprocal compensation rather than access charges. The court then needed to decide what rate per minute GNAPs had to pay Verizon for access charges and the interest rate.

The court found GNAPs had admitted that Verizon had sent GNAPs more than 10 billion minutes of calls for delivery to its VNXX customers. Applying judicial estoppel, it held that 90 percent of GNAPs' traffic was interstate.

This left the question of how of those minutes were delivered to "local" ISPs and therefore were subject to reciprocal compensation rather than access charges. The court held that 21.78 percent of calls were to local ISPs.

That gave a total of over 7.5 billion minutes subject to access charges. The court multiplied that figure by the rate per

minute.  As to the rate per minute, the court held GNAPs was judicially estopped from contesting that rate was $0.00525.  It added 18 percent annual prejudgment interest per Mass. Gen. Laws ch. 231, § 6C.  After reducing the total owed by the amount of security for an injunction the court had already released to Verizon, the district court entered judgment for $57,716,714.

### a.  The Judicial Estoppel Ruling Was Not Error

The court's application of estoppel is well supported in the record.  Verizon began billing GNAPs in early 2003.  GNAPs made no payments for two years, so Verizon tried to terminate its service to GNAPs in March 2005, which led to the litigation discussed in GNAPs III.  In June 2005, the district court granted GNAPs' motion for a temporary restraining order (TRO) in the pending litigation while GNAPs argued that the DTE's decision was preempted.  After hearing evidence, the court rejected GNAPs' claim and refused to grant an injunction pending appeal.  In light of GNAPs' claim that its very existence was threatened, this court granted an injunction while we decided GNAPs III, which we lifted in April 2006.  The injunction was conditioned on GNAPs posting security of $15 million in addition to the $1 million GNAPs had already posted.

In order to obtain the TRO from the district court and the injunction, pending appeal, from this court, GNAPs presented an "all-or-nothing" argument: if the DTE's order was not preempted,

then GNAPs admittedly owed access charges to Verizon. GNAPs represented to both courts that those access charges were so high that GNAPs could not afford to continue providing service in Massachusetts--and could fail altogether--if it had to pay them. It argued the balance of harms to GNAPs and its customers meant Verizon should be required to continue service, despite GNAPs' failure to pay for that service.

GNAPs made this argument in its briefs and at oral argument. In its motion for the TRO, GNAPs represented to the district court that Verizon charged $0.00525 per minute and relied on that fee in its claims about irreparable injury. In fact, by April 2005, Verizon had for a year been billing GNAPs at a rate of at least $0.006114 per minute. The district court, for purposes of this case, permissibly found that it was GNAPs that had suggested the lower $0.00525 rate and "stipulated it" "[a]s a number satisfactory to it."

Further, in this court, GNAPs represented a willingness to post security in the sum of almost $18 million to satisfy any harm to Verizon, a figure consistent with the stipulated rate. Yet it now asserts that Verizon's billing rate should be adjusted downward to $0.0008140, a rate that would have significantly weakened the irreparable harm argument GNAPs presented at the time.

GNAPs made one other critical representation. When moving the district court for an injunction pending appeal, GNAPs

submitted an employee affidavit asserting that "90% of Global's revenue is derived from its ISP customers in Massachusetts." GNAPs repeatedly made other claims that similarly suggested a the overwhelming majority of its customers were in Massachusetts. Now, GNAPS tries to walk away from both of these representations, on which the courts have relied.

This court ruled that GNAPs owed access charges to Verizon in April 2006, GNAPs III, 447 F.3d at 75, and dissolved the injunction. In May 2006, in opposition to Verizon's motion to release the security GNAPs had posted, GNAPs first suggested that the Verizon billing rate was too high and argued that the proper rate was either $0.0007 or $0.002124. In 2007, however, this court affirmed the district court's order releasing that security. GNAPs IV, 489 F.3d at 24-25. We expressly rejected GNAPs' belated argument that Verizon was overcharging it and held GNAPs to its prior, higher estimate of the amount of access charges it owed. Id.

In 2008, concluding that GNAPs III clearly established that GNAPs owed access charges, the district court turned to considering damages. As trial approached, GNAPs filed a motion in limine regarding potential damages it owed. It attached an expert report concluding that Verizon was overcharging GNAPs and that at least 75 percent of its customers were located outside Massachusetts. On December 4, 2008, the district court held a

pretrial hearing to resolve several issues. After the hearing, the court held GNAPs was judicially estopped from disputing that it owed $0.00525 per minute or that 90 percent of its customers were in Massachusetts.

Judicial estoppel is an equitable doctrine that prevents litigants from taking inconsistent positions in the same or a related case. New Hampshire v. Maine, 532 U.S. 742, 741-50 (2001); Alternative Sys. Concepts, 374 F.3d at 32-33. Its purpose is to protect the integrity of the judicial system from litigants "playing fast and loose with the courts" to "obtain[] an unfair advantage." Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 207, 212 (1st Cir. 1987) (internal quotation marks omitted); see also New Hampshire, 532 U.S. at 749-50. Our review is limited to abuse of discretion.

There is no doubt that GNAPs deliberately played fast and loose with the courts in an effort to gain an unfair advantage. The district court justifiably--indeed correctly--held that GNAPs should be held to its tactical choice.

GNAPs argues that its recent positions were not really inconsistent with its prior positions. It says that it was only telling the district court that Verizon charged $0.00525 per minute, not espousing that figure. And it offers a variety of reasons why it did not really mean that 90 percent of its ISP customers were in Massachusetts. GNAPs also urges it was entitled

-36-

to contest and conduct discovery on the amount of charges it owed after losing its preemption argument.

As to the first two points, GNAPs did adopt the $0.00525 figure--and only that figure--and it did not qualify the 90 percent figure as it now attempts to do.  If those figures were not accurate, GNAPs certainly misled the courts.  See Cadle Co. v. Schlictmann, Conway, Crowly & Hugo, 338 F.3d 19, 22 (1st Cir. 2003) ("Our focus is on the impression [the estopped party's] statements reasonably created in the District Court.").

The final assertion does not hold because GNAPs had plenty of time and every incentive to investigate Verizon's billing rate by 2005 when it made these representations.  See Alternative Sys. Concepts, 374 F.3d at 35-36 (holding that a party could not avoid judicial estoppel by failing to discover "readily available" information).  It was not entitled to wait until it lost on all its other claims.  One term for that strategy is "sandbagging," and the district court was right to prevent GNAPs from executing it.

        b.   The District Court Properly Granted Summary Judgment on the Issue of Excludable Local Minutes

GNAPs argues that the district court erred by concluding, on summary judgment, that about 21 percent of traffic between the parties was local and not subject to access charges.  The district court reasoned that GNAPs had not "proffer[ed] any countervailing

admissible data regarding the location of its customers" and that this was information GNAPs could have provided.

GNAPs argues that two proffers created genuine issues of material fact. One was excluded from evidence: a late "supplemental declaration" by GNAPs' expert, which GNAPs filed one week before trial, without leave, and which presented a new theory that differed from the expert's earlier affidavit. The court also held that a Verizon employee's e-mail did not create a genuine issue of fact.

We will not overturn the court's enforcement of its timetable for expert reports. See Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003); see also Levin v. Dalva Bros., Inc., 459 F.3d 68, 72 (1st Cir. 2006). GNAPs claims it had to submit this report quickly and tardily because the district court made a "sudden" bench ruling. That ruling did not discuss the percentage of local traffic; indeed the court acknowledged that issue remained open.

Without that excluded report, the court had before it GNAPs' expert's original report and Verizon's report, which agreed that 21 percent was the proper figure. No factual dispute remained.[23]

---

[23] GNAPs argues the court had to rely on the data underlying its expert's supplemental report, which it says was publicly available. Because GNAPs did not include that information in the record in an admissible pleading, the court properly did not consider it. See, e.g., Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (affirming summary judgment when the party did not submit "a valid affidavit or some other admissible evidence" in

GNAPs next argues the district court could not infer, on summary judgment, that a Verizon employee's e-mail overestimated the number of local minutes of traffic between GNAPs and Verizon. That e-mail expressly gave data from a Verizon system called Traffic Track. Verizon submitted undisputed evidence that Traffic Track overestimated minutes for VNXX traffic.[24]

GNAPs argues the district court applied the wrong standard for summary judgment by "assum[ing]" that this e-mail relied only on Traffic Track data. The district court was required only to draw "all <u>reasonable</u> inferences" in GNAPs' favor. <u>Mosher</u> v. <u>Nelson</u>, 589 F.3d 488, 492 (1st Cir. 2009). The e-mail relied only on Traffic Track data and did not hint at any other basis for its calculation of local traffic. Absent evidence from GNAPs that some other source other than Traffic Track for the e-mail's figures existed, the district court properly held the e-mail did not raise a genuine factual issue.

### c. GNAPs Has Not Shown the District Court Erred in Its Damages Calculations

GNAPs raises three objections to the court's damages calculation, which we reject.

---

support); <u>see</u> <u>also</u> <u>Mosher</u> v. <u>Nelson</u>, 589 F.3d 488, 492 (1st Cir. 2009) (noting that courts on summary judgment may rely on <u>competent</u> evidence).

[24]  According to Verizon's unrebutted evidence, Traffic Track determines locations based on phone numbers. It cannot accurately calculate traffic involving VNXX numbers, which by definition do not correspond to their owners' locations.

GNAPs first argues Verizon improperly failed to exclude from the calculation "transit traffic," which is traffic that did not originate from a Verizon customer. The parties agree Verizon used the number of minutes of use GNAPs supplied when GNAPs sent Verizon invoices for reciprocal compensation.[25] In discovery, GNAPs admitted its invoices correctly reported the number of minutes of traffic between Verizon's and GNAPs' customers. That admission conclusively established that Verizon's invoices did not bill GNAPs for transit traffic. See Fed. R. Civ. P. 36(b).

GNAPs next argues that the district court should have subtracted the percentage of local calls from all the minutes of use, not just from the number of intrastate minutes (90 percent of the total). GNAPs does not explain why. This argument is waived. See, e.g., Day v. Staples, 555 F.3d 42, 57 n.14 (1st Cir. 2009).

GNAPs finally argues that there was an interest rate error: it says that the district court should have applied 12 percent rather than 18 percent interest. Massachusetts law imposes prejudgment interest either at the contract rate or at 12 percent per annum. Mass. Gen. Laws ch. 231, § 6C.[26] GNAPs says that Verizon agreed to 12 percent interest. But Verizon proposed using

---

[25] GNAPs claims it could seek reciprocal compensation for transit traffic. The parties' ICA flatly contradicts that assertion, and so GNAPs' bills could not have included transit traffic.

[26] The parties do not contest applying Massachusetts law.

that rate if GNAPs would settle and not go to trial,[27] and GNAPs did not settle.  When GNAPs did not settle, the district court properly applied the undisputed interest rate the ICA imposes, 18 percent.

> 2. There Was No Error in the Award to Verizon on Its Counterclaim for Alter Ego Liability and Disregard of the Corporate Form

> > a. The District Court Did Not Abuse Its Discretion by Granting Default Judgment as a Discovery Sanction

The district court granted default judgment on count three of Verizon's counterclaim as a sanction for willful discovery misconduct against GNAPs, the GNAPs companies, and Frank Gangi. The court ruled these defendants had violated the court's past discovery orders and the rules of discovery.  To reach this conclusion, the court made a number of factual findings that are well supported in the record.

First, the court found that Janet Lima, the GNAPs companies' bookkeeper, and Frank Gangi, their owner, lied to the court about the records GNAPs kept.  Lima and Gangi insisted that the companies did not keep a general ledger or any financial documents.  They recorded financial transactions in one computer accounting program, called Peachtree.  Otherwise, they claimed to rely on the bank to keep records, which they could request as needed.  Gangi and Lima also both repeatedly claimed ignorance of

---

[27] The district court agreed it was prepared "to order that and save [GNAPs] 6 percent."

basic information about how the companies processed their finances, even though Lima kept the companies' books and wrote their checks and Gangi owned the companies and paid their taxes.[28]

The district court could easily find that Lima's and Gangi's description of the accounting practices of the GNAPs companies, Ferrous, and Gangi was "inherently incredible" and "ma[de] no sense." That conclusion was also supported by Verizon's forensic accountant, who testified that the companies' claimed accounting and record-retention practices were irregular.

As the district court also found, evidence suggested the defendants actually had kept general ledgers and similar records. GNAPs' chief financial officer testified that Gangi regularly gave her the company's bank statements. Gangi's accountant, Edward Taylor, testified that he prepared Gangi's and Ferrous's 2006 tax return in March 2007 using information from Peachtree, bank statements, and a general ledger.

Second, the court supportably found that the defendants had withheld and destroyed financial records. Lima testified that information in the one place the companies kept financial records--Peachtree--was lost in December 2006, when she dropped her computer

---

[28]    Lima, for instance, testified she did not remember writing checks bearing her name or how checks were handled at the companies. Frank Gangi claimed he knew nothing about the GNAPs companies' or his own finances and relied entirely on his accountants. Gangi testified that he did not even know where he had bank accounts. He said that if he wanted to know whether he had an account at a bank, he would call that bank.

down a flight of stairs. Then, on June 12, 2007, she suffered another mishap with her new computer: she deleted files using a program called Windows Washer, Lima said to avoid having family information produced during discovery.

The court could conclude that Lima's stories were "wholly incredible." Both of her alleged computer mishaps were suspiciously timed. Lima "dropped" the first computer just as the court was beginning to scrutinize the defendants' finances. And the "accidental" computer wipe occurred just minutes before GNAPs' attorneys arrived to collect discovery records, which Lima knew.

Instead, the court supportably (indeed, logically) credited testimony by a computer expert that someone intentionally wiped relevant evidence from Lima's computer hard drive and then defragmented the drive to make recovery even more difficult. Lima admitted using a computer program, Windows Washer, to delete personal files. But the expert testified that Windows Washer was run in a "shred/wash with bleach" setting that is not a default, that must be intentionally activated, and that more thoroughly wipes the computer.

Moreover, the expert testified that only some programs were destroyed, while others--such as Microsoft Office--were unharmed. Most destroyed files and programs appeared to relate to financial records. Peachtree, conveniently, was destroyed, as were files named "Accounting," "Billing," "Janet," and "Peach" and

shortcuts named with words like "check" and "cash." The district court could conclude that this file destruction was intentional and targeted at relevant financial records.

Third, the court supportably determined that the defendants lied to the court about when they "lost" their financial records. As the court explained, Gangi's accountant, Taylor, testified that he was able to prepare Gangi's and Ferrous's tax return in March 2007, which included the GNAPs' companies taxes. Taylor prepared those taxes months after Lima said she dropped her computer down stairs and at the same time the defendants were stonewalling efforts to discover their financial records.

On appeal, the defendants argue that the district court should have credited their insistence that they were guilty only of poor record keeping and accidents. That story was contradicted by evidence and common sense. The court certainly could conclude the better explanation was that the defendants had willfully concealed and destroyed evidence.

Aside from their factual challenges, the defendants raise one further argument against default judgment. They urge that the district court's discovery orders were directed at GNAPs, not them. We will defer to the district court's contrary interpretation of its own orders. Cf. Lefkowitz v. Fair, 816 F.2d 17, 22 (1st Cir. 1987). The court issued several such orders after the counterclaim

defendants were added.[29] Those orders compelled production of evidence in the possession of all defendants, including evidence of their finances and evidence they produced in the SNET case.

In sum, significant evidence supported the district court's conclusion that GNAPs, the GNAPs companies, and Frank Gangi violated its orders and committed willful discovery misconduct. There was certainly no abuse of discretion.

b.  The District Court Properly Collaterally Estopped Ferrous from Disputing Its Misconduct

The district court held GNAPs' holding company, Ferrous, was collaterally estopped from challenging the SNET court's ruling that Ferrous (and other defendants in this appeal) committed willful discovery misconduct by withholding and destroying evidence. 251 F.R.D. at 96-97. The court found that the defendants lied about what financial records they kept and destroyed computer files in bad faith; removed evidence from the home of Richard Gangi, the GNAPs companies' chief financial officer, after his death; and did not cooperate fairly with discovery. Id. at 90-95.

---

[29]  GNAPs argues, without citation, that the court needed to find prejudice to Verizon and erred by so finding. Assuming, dubitante, that prejudice is a requirement, Verizon obviously suffered it from losing information about the defendants' finances while it sought to recover nearly $58 million in overdue access charges.

Federal common law governs claims that a party is precluded from relitigating an issue already decided in a federal court. See Negrón-Fuentes v. UPS Supply Chain Solutions, 532 F.3d 1, 7 (1st Cir. 2008). Issue preclusion requires that (1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits. GNAPs II, 427 F.3d at 44.

Ferrous argues that a default judgment is not a judgment on the merits for issue preclusion purposes and that, in any event, the issues litigated in this case were not similar to those in SNET.

Ferrous misunderstands the issues the district court in this case was precluding it from relitigating. Ferrous is correct that default judgment generally is not a judgment on the merits of the underlying claim in issue preclusion cases because a default judgment does not decide the merits of that claim. See 18A Wright, Miller & Cooper, Federal Practice & Procedure § 4440, at 210-13 (2d ed. 2002). The Massachusetts district court was not holding Ferrous precluded from litigating the merits of the underlying claim alleging alter ego liability and disregard of the corporate form. It was holding that Ferrous was precluded from relitigating the issues which underpinned the SNET court's judgment--whether Ferrous willfully concealed and destroyed evidence. The

-46-

Connecticut district court's ruling was certainly a judgment on the merits of those issues.  See SNET, 251 F.R.D. at 96-97.

When the issue is framed properly, preclusion was appropriate; the Massachusetts court did not need to relitigate whether Ferrous willfully destroyed evidence.  Both proceedings involved the same factual and legal issue--discovery misconduct under Rule 37(b)--and relied on much the same evidence.  See id. at 85, 90-96.  Ferrous had a full and fair opportunity to dispute those allegations and lost.  The district court in this case could prevent it from disputing its misconduct again.

IV.

The district court has handled this difficult and very complicated matter with admirable care.

Judgment against GNAPs for $57,716,714 on count one is affirmed.  Default judgment on count three imposing joint and several liability on all appellants is affirmed.